**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL T. TOWNSEND**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:11cv823 |
| v. | ) | **Electronic Filing** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

July 12, 2012

**I.   INTRODUCTION**

Michael T. Townsend ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 9, 11). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is GRANTED, in part, and DENID, in part, and Defendant's Motion for Summary Judgment is DENIED.

**II.   PROCEDURAL HISTORY**

Plaintiff applied for SSI on August 14, 2008, claiming that he was disabled as of March 15, 2008, due to functional limitations stemming from physical impairments. (R. at 12).[1] Plaintiff was initially denied benefits on March 25, 2009. (R. at 46 – 50). A hearing was scheduled for August 27, 2009, and Plaintiff, represented by counsel, appeared to testify. (R. at 314 – 36). A vocational expert also testified. (R. at 314 – 36). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on September 17, 2009. (R. at 12 – 19). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which was denied on April 18, 2011, making the decision of the ALJ the final decision of the Commissioner. (R. at 4 – 6).

Plaintiff filed his Complaint in this court on June 28. 2011. (ECF No. 3). Defendant filed his Answer on September 12, 2011. (ECF No. 4). Cross motions for summary judgment followed. (ECF Nos. 9, 11).

**III.   STATEMENT OF THE CASE**

**A. General Background**

Plaintiff claimed he was disabled due to limitations stemming from lumbar disc disease, lumbar spinal stenosis, and general lower back pain – all progressively worsening. (R. at 63, 82). His ability to lift and carry objects, and to sit, stand, and engage in other postural movements, was allegedly quite limited. (R. at 63, 79). Plaintiff stated that he stopped working on July 8, 2004, because his conditions had become so severe that he could no longer perform

---

[1]   Citations to ECF Nos. 5 – 5-4, the Record, *hereinafter*, "R. at __."

his job.  (R. at 63).  He had not worked since that time.  (R. at 63).  Plaintiff's prior employment consisted primarily of labor, construction, and mechanical work.  (R. at 64).

Plaintiff was born on July 17, 1965.  (R. at 317).  At the time of his administrative hearing, Plaintiff was forty four years of age.  (R. at 317).  Plaintiff did not complete high school, but did earn a GED.  (R. at 317).  He received no post-secondary education, but did receive vocational training at the Pittsburgh Diesel Institute.  (R. at 68).  At the time of his administrative hearing, Plaintiff lived in an apartment with his wife, three daughters, and grandson.  (R. at 74, 320 – 21).

In his own functional report of day-to-day activity, Plaintiff explained that he had difficulty sitting and standing for prolonged periods due to pain, and spent much of his day alternating positions.  (R. at 74).  He also needed to lie down several times a day.  (R. at 74).  His pain was often so severe it woke him at night.  (R. at 75).  The pain experienced was constant, and required the use of prescription medication for relief.  (R. at 82 – 83).  While he was capable of self-care, he noted that he occasionally required help tying his shoelaces.  (R. at 75).

Plaintiff no longer cooked, and was relegated to only very light housework.  (R. at 76).  Plaintiff preferred to leave his apartment at least once a day.  (R. at 77).  He maintained a driver's license and was capable of driving a vehicle.  (R. at 77).  Plaintiff maintained that he could not drive alone, however, because of a fear that his back would lock up and interfere with his driving.  (R. at 77).  He also refused to drive long distances.  (R. at 77).  Plaintiff had given up most hobbies, and only occasionally socialized with his son or brother at their respective homes.  (R. at 78).  Plaintiff utilized a cane to ambulate, although it had not been prescribed by a physician.  (R. at 80).

Plaintiff completed a "Pain Diary" to catalog pain and limitation related to his back conditions over a period spanning April 2009 through July 2009. (R. at 102 – 207). On a pain scale of 1 – 10, Plaintiff typically indicated his daily pain to range between 8 and 10. (R. at 102 – 207). Plaintiff also reported poor sleep, fairly high fatigue, and significant weakness. (R. at 102 – 207). His ability to maintain balance was somewhat affected by his back conditions, and his ability to walk was seriously affected. (R. at 102 – 207). Plaintiff typically experienced shooting and burning pain in his hips and legs, as well as numbness and "pins and needles." (R. at 102 – 207).

### B. Medical History

An x-ray of Plaintiff's lumbosacral spine was taken on April 1, 2008. (R. at 220). The x-ray revealed the presence of significant degenerative changes at the L5 – S1 level of the spine with respect to both disc space and facet and degenerative hypertrophic changes. (R. at 220). Underlying spinal canal stenosis was of concern. (R. at 220). An MRI of Plaintiff's lumbar spine was taken on April 14, 2008. (R. at 216). The image report stated that Plaintiff exhibited only mild central stenosis at L5 – S1 due to a diffuse disc bulge. (R. at 216). At L4 – L5, Plaintiff had moderate stenosis, with accompanying degenerative facet joint changes and hypertrophy of the posterior ligaments. (R. at 216). At L3 – L4, there was mild central disc bulging causing only mild stenosis. (R. at 212 – 15).

Plaintiff visited Curt Conry, M.D. for a neurosurgical evaluation on June 13, 2008. (R. at 209 – 210). Dr. Conry noted Plaintiff's complaints of pain and limitation, and also noted that Plaintiff alleged experiencing such pain for approximately twenty years – progressively worsening over time. (R. at 209 – 210). Plaintiff could cite to no particular triggering event, however. (R. at 209 – 210). Plaintiff reported not working for several years due to his pain. (R.

at 209 – 210). He engaged in some physical therapy which allegedly helped for a brief period. (R. at 209 – 210). Formal pain management had not been attempted, but Plaintiff did take pain medication in the form of hydrocodone and ibuprofen. (R. at 209 – 210).

Upon examination, Dr. Conry observed that Plaintiff was unhealthy in appearance, and significantly overweight. (R. at 209 – 210). Plaintiff's strength in all muscle groups and his sensation to light touch was full. (R. at 209 – 210). Feeling in his feet was decreased, however. (R. at 209 – 210). Plaintiff's reflexes were not particularly strong in his bilateral extremities, he had severe pain on palpation of his lumbar spine, and he had severe pain on straight leg raises to forty five degrees. (R. at 209 – 210). Yet, he could ambulate well, and could walk on his heels and toes without significant difficulty. (R. at 209 – 210). Dr. Conry interpreted recent MRI scans to show severe degenerative disc disease at the L5 – S1 level of the spine, associated with osteophyte/disc complex causing severe bilateral L5 nerve root compression. (R. at 209 – 210).

Dr. Conry's diagnosis was L5 – S1 severe degenerative disc disease with associated spinal and foraminal stenosis. (R. at 209 – 210). Dr. Conry suggested that Plaintiff was a candidate for posterior lumbar interbody fusion, but wished to attempt more conservative treatments first. (R. at 209 – 210). Plaintiff was to try physical therapy, injections, and muscle relaxants and report back with the results. (R. at 209 – 210).

On July 23, 2008, Plaintiff appeared before Levi K. Zimmerman, M.D. to potentially engage in a pain management program. (R. at 212 – 15). Dr. Zimmerman reported that Plaintiff complained of progressively worsening back pain beginning approximately twenty years earlier. (R. at 212 – 15). Plaintiff complained of lower back pain that radiated into his hips and thighs, but no farther than his knees. (R. at 212 – 15). Plaintiff's pain was described as constant, and was associated with some numbness in his lower extremities. (R. at 212 – 15). He denied any

associated weakness. (R. at 212 – 15). According to Plaintiff there was no position which afforded him relief, and his pain was exacerbated by postural movements, sitting, standing, and walking. (R. at 212 – 15). Medications provided some relief. (R. at 212 – 15). Plaintiff informed Dr. Zimmerman that he had never received injections for pain, and that physical therapy and chiropractic care had provided him no relief. (R. at 212 – 15).

Dr. Zimmerman remarked that a lumbosacral x-ray of Plaintiff's spine indicated significant degenerative changes at the L5 – S1 level of Plaintiff's spine with respect to both disc spacing and facet and degenerative hypertrophic changes and underlying spinal stenosis. (R. at 212 – 15). An MRI showed mild central stenosis at the L5 – S1 level of the spine as a result of a diffuse disc bulge, and there was bilateral neural foraminal narrowing. (R. at 212 – 15). At L4 – L5, there was moderate stenosis with significant degenerative facet changes. (R. at 212 – 15). At the L4 – L3 level, there was mild central disc bulging, and only mild stenosis. (R. at 212 – 15).

Upon physical examination, Plaintiff was found to be overweight and exhibited somewhat poor hygiene. (R. at 212 – 15). Plaintiff had good bicep, patellar, and Achilles tendon reflexes. (R. at 212 – 15). No pain mannerisms were witnessed by Dr. Zimmerman. (R. at 212 – 15). Plaintiff had full strength with hip flexion, knee extension, dorsal and plantar flexion, and biceps, triceps, and shoulder shrugs. (R. at 212 – 15). Straight leg raising was negative, bilaterally. (R. at 212 – 15). There was, however, a positive pelvic rocking test, positive Gaenslen test, positive Yeoman's test, and positive FABER test. (R. at 212 – 15). There was tenderness upon palpation of the paraspinous lumbar region. (R. at 212 – 15).

Plaintiff was diagnosed with degenerative disc disease and spinal stenosis. (R. at 212 – 15). Dr. Zimmerman generally discussed conservative treatment modalities. (R. at 212 – 15).

Despite Plaintiff's claim that physical therapy had proven ineffective in the past, Dr. Zimmerman recommended trying physical therapy again. (R. at 212 – 15). Dr. Zimmerman also advised Plaintiff to significantly reduce his weight to improve his back condition. (R. at 212 – 15). Dr. Zimmerman recommended injections for pain, but Plaintiff refused because he claimed that his brothers had received such injections in the past without relief. (R. at 212 – 15). Plaintiff preferred to continue with medication management. (R. at 212 – 15).

On February 18, 2009, Plaintiff was examined by Ellen Mustovic, M.D. on behalf of the Bureau of Disability Determination. (R. at 250 – 55). Dr. Mustovic reported on Plaintiff's history of back pain, conservative treatment, diagnostic imaging results, and recommendations from Drs. Conry and Zimmerman. (R. at 250 – 55). Plaintiff informed Dr. Mustovic that he had no interest in undergoing surgery. (R. at 250 – 55). He complained of difficulty bending, constant pain and numbness radiating into his legs, and weakness. (R. at 250 – 55). Plaintiff attended five physical therapy sessions prior to being seen by Dr. Mustovic, but claimed he enjoyed no pain relief. (R. at 250 – 55). Plaintiff informed Dr. Mustovic that he had not tried chiropractic treatment, injections, bracing, or a TENS unit. (R. at 250 – 55). At that time, he treated with only pain medications. (R. at 250 – 55). Dr. Mustovic felt that Plaintiff's treatment history was very limited. (R. at 250 – 55).

Dr. Mustovic observed that Plaintiff was overweight. (R. at 250 – 55). Also, Plaintiff used a cane to ambulate after his back allegedly "went out" six weeks prior to his evaluation. (R. at 250 – 55). Plaintiff had a slightly wide, antalgic gait, and it made no difference in his ability to ambulate whether or not he used his cane. (R. at 250 – 55). Plaintiff spent part of the evaluation sitting, and part of it standing. (R. at 250 – 55). He sighed and groaned frequently during his time with Dr. Mustovic. (R. at 250 – 55). Dr. Mustovic could not obtain any reflexes

in bilateral upper or lower extremities. (R. at 250 – 55). Plaintiff had full strength in his extremities, but did give way to pain during hip flexion. (R. at 250 – 55). There was decreased sensitivity to light touch in the lateral aspects of Plaintiff's thighs. (R. at 250 – 55).

Dr. Mustovic could not test range of motion in Plaintiff's hip due to allegations of pain. (R. at 250 – 55). Plaintiff did have full knee and ankle range of motion, and he could squat and rise with support. (R. at 250 – 55). Lumbosacral flexion and bending was limited. (R. at 250 – 55). Plaintiff could dress and undress independently, and could climb onto the examination table with the use of a stool. (R. at 250 – 55). Dr. Mustovic reported that Plaintiff spent most of the day watching television, and that he was capable of completing activities of daily living independently. (R. at 250 – 55). His hygiene was poor. (R. at 250 – 55).

Dr. Mustovic diagnosed Plaintiff with severe degenerative disc disease at L5 – S1. (R. at 250 – 55). He was determined capable of frequent lifting of two to three pounds, and occasional lifting of up to twenty-five. (R. at 250 – 55). Plaintiff could frequently carry two to three pounds, and occasionally carrying up to twenty. (R. at 250 – 55). Plaintiff could stand and walk for two to four hours at a time if able to change positions as needed. (R. at 250 – 55). He could sit for up to four hours with the same accommodation. (R. at 250 – 55). He could occasionally bend and kneel, but could never stoop, crouch, balance, or climb. (R. at 250 – 55). Heights and temperature extremes were to be avoided. (R. at 250 – 55).

State agency evaluator Juan B. Mari-Mayans, M.D. performed a physical residual functional capacity ("RFC") assessment of Plaintiff on March 9, 2009. (R. at 258 – 64). Dr. Mari-Mayans diagnosed Plaintiff with lumbar degenerative disc disease. (R. at 258 – 64). More specifically, he found that Plaintiff could frequently lift/carry ten pounds, and occasionally lift/carry twenty, Plaintiff could stand/walk at least two hours of an eight hour day, and sit for

approximately eight hours, and Plaintiff was unlimited with respect to pushing and pulling. (R. at 258 – 64). No other limitations were provided. (R. at 258 – 64).

Lastly, the record contained the treatment notes from Plaintiff's primary care physician. (R. at 226 – 47, 265 – 80). Plaintiff was regularly prescribed prescription pain medication for his back conditions. (R. at 226 – 47, 265 – 80). Plaintiff was consistently noted to suffer from chronic back pain. (R. at 226 – 47, 265 – 80). Some pain relief was attributed to Plaintiff's medications. (R. at 226 – 47, 265 – 80).

### C. Administrative Hearing

At his hearing, Plaintiff testified that he split his days between lying in bed, sitting in his chair, or trying to walk around his apartment. (R. at 321). Occasionally, he attempted to walk outside. (R. at 321). He claimed that he could walk approximately one hundred yards before requiring a rest. (R. at 321). At that point he must sit down because his lower back begins to go numb, the sides of his legs begin to burn, and he gets a "pins and needles" feeling in both his legs. (R. at 321). To climb up and down a staircase, Plaintiff required the use of a handrail. (R. at 327). He also often required a stop to rest approximately half-way up or down. (R. at 327). To get up out of his chair, he needed to use the armrests to push, and it took him some time to straighten his back to stand. (R. at 329 – 30). Plaintiff did not require help dressing, but admitted to some difficulty putting on socks. (R. at 328). He did not help with chores around the house. (R. at 327). Plaintiff did occasionally drive to visit friends and family, but could not drive long distances, and could not visit for long periods of time. (R. at 328 – 29).

Alleged that his legs were in constant pain and that, on a pain scale of 1 to 10, his leg pain averaged between 9 and 10. (R. at 322). Pain medication might reduce his pain by half a point, and lasted only a few hours. (R. at 322 – 23). Alternating between sitting and standing

positions also provided some relief. (R. at 326). His pain prevented him from getting restful sleep. (R. at 329). He also relied upon family members to "do everything." (R. at 329). Plaintiff explained that he declined to attempt surgical intervention for his condition, because his physician allegedly told him that additional surgeries would be required in the future. (R. at 326). Plaintiff stated that in addition to taking pain medication, he was attempting to improve his condition by losing weight. (R. at 326 – 27).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would qualify for a significant number of jobs in existence in the national economy if limited to light work, and unable to climb ladders, ropes, or scaffolds, balance, crawl, perform repetitive reaching with the right arm, use foot controls of any kind, drive, or use a chair without armrests. (R. at 331). Additionally, the hypothetical person would require the ability to sit and stand, as needed, and would need to avoid workplace hazards. (R. at 331). In response, the vocational expert stated that such a person would be capable of working as a "light guard," with 300,000 positions available in the national economy, as a "gate guard," with 300,000 positions available, or as a "copy machine operator," with 100,000 positions available. (R. at 332 – 34).

Plaintiff's attorney followed the ALJ's question by asking the vocational expert to assume the same set of facts, but limit the hypothetical individual to no more than four hours sitting, and no more than two to four hours standing or walking. (R. at 335). The vocational expert replied that based upon that hypothetical, the individual could be limited to as few as six hours of work per day, in which case he or she would be unable to maintain substantial gainful activity. (R. at 335). Full-time employment requires an individual to be capable of working eight hour days, consistently. (R. at 335).

**IV.	STANDARD OF REVIEW**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v.*

---

[2]	Section 405(g) provides in pertinent part:

*Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis.

---

Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]   Section 1383(c)(3) provides in pertinent part:
The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d Cir. 1986).

## V. DISCUSSION

In his decision, the ALJ determined that Plaintiff suffered severe, medically determinable impairments in the way of degenerative disc disease of the lumbar spine, status post rotator cuff tear of the right shoulder, and obesity. (R. at 14). As a result of said impairments, the ALJ found Plaintiff capable of performing only light exertional work, not involving climbing ropes, ladders, or scaffolds, any balancing or crawling, any repetitive work above shoulder level or repetitive reaching with the right arm, or use of any foot controls. (R. at 15). Plaintiff was also to avoid workplace hazards and occupational driving, and was to have a chair with an armrest made available, as well as the ability to sit and stand at his discretion. (R. at 15). Based upon the vocational expert's testimony, the ALJ concluded that even with these limitations, Plaintiff was capable of engaging in substantial gainful activity existing in significant numbers in the national economy. (R. at 17 – 18). Plaintiff was, therefore, denied benefits.

Plaintiff objects to the decision of the ALJ, arguing that he erred in failing to find Plaintiff disabled at Step 3 of the five-step analysis, in failing to properly develop Plaintiff's RFC, and in failing to pose an adequate hypothetical question to the vocational expert. (ECF No. 10 at 11, 14, 17). Defendant counters that the ALJ supported all of his conclusions with

substantial evidence, and that Plaintiff failed to meet his burden of proof. (ECF No. 12 at 10, 15, 19). The record evidence, however, supports Plaintiff's request for remand.

### A. **Step 3 Analysis**

At Step 3 in his decision, the ALJ concluded that Plaintiff did not meet or medically equal any listed impairment within 20 C.F.R., Pt. 404, Subpt. P, App'x 1. (R. at 14). Specifically, the requirements of Listings 1.02 (Major Dysfunction of a Joint(s)) and 1.04 (Disorders of the Spine) were not met. (R. at 14 – 15). Plaintiff asserts that there was sufficient evidence provided to illustrate that the conditions of 1.04 were met – particularly 1.04(A) and 1.04(C). (ECF No. 10 at 11 – 14). The ALJ's rationale supporting his Step 3 findings was allegedly deficient, and a properly thorough discussion of the record would allegedly have demonstrated this point. Listing 1.04 states, in relevant part, that Plaintiff must show there exist:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> \*\*\*
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App'x 1.

Regarding Step 3 determinations, the ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F. 3d 501, 505 (3d Cir. 2004). *See Scatorchia v. Comm'r of Soc. Sec.*, 137 Fed. App'x 468, 470 – 71 (3d Cir. 2005) (an ALJ satisfies his burden "by clearly evaluating the available medical evidence in the record and then setting forth the evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing"). An ALJ's discussion – when read as a whole – is supported by substantial evidence when it reveals that the ALJ considered the appropriate facts when deciding that a claimant did not meet any specific disability listings. *Id.*

Presently, as pointed out by both Plaintiff and Defendant in their respective briefs, the objective medical findings on record have been conflicting with respect to the requirements of both 1.04(A) and (C). While it is the ALJ's imperative to choose between conflicting accounts, he or she must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). If the ALJ has not adequately explained his or her treatment of obviously probative evidence, the court cannot say whether substantial evidence supports an ALJ's conclusion. *Id.* at 705.

Beginning with 1.04(C), the ALJ adequately justified his rejection of the listing by noting that there were no objective findings on the record that Plaintiff could not ambulate effectively. (R. at 15 – 17). Although Plaintiff did have some limitation in terms of walking, he was never prescribed any assistive devices by his treating medical sources. (R. at 15 – 17). However, with respect to 1.04(A), there were significant conflicts in the medical evidence that were not addressed in the ALJ's decision. The ALJ noted that certain excerpts from the records of various

treating sources indicated that Plaintiff benefitted from medication, that he had full strength in his legs, he had negative straight leg raising, he had a limited treatment history, he had the ability to function independently at home, and that he needed to lose weight. (R. at 16 – 17). However, as pointed out by Plaintiff, the ALJ failed to significantly address why he favored said findings over those which indicated that Plaintiff had a long history of significant degenerative changes, spinal stenosis, and nerve root compression, chronic, severe pain, decreased sensation, severe pain with straight leg raising, no/diminished reflexes, limited lower back flexion and bending, and loss of strength due to pain. (ECF No. 10 at 13 – 14; R. at 209 – 10, 212 – 15, 220, 250 – 55).

As a result, the ALJ's decision – even when considered as a whole – does not allow this Court the ability to determine if significant probative evidence relating to Listing 1.04(A) was not credited or simply ignored. *Fargnoli v. Massanari*, 247 F. 3d 34, 42 (3d Cir. 2001). "Courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." *Cotter*, 642 F.2d at 705 n. 7 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). As a result, the ALJ's decision requires the court remand for a re-examination of Step 3.

### B. RFC Assessment

Plaintiff next argues that the ALJ's RFC assessment was not supported by substantial evidence because the ALJ failed to attribute any of his specific findings to objective medical evidence from Plaintiff's treating sources, and more specifically, failed to properly account for certain findings addressing Plaintiff's ability to sit, walk, and stand. (ECF No. 10 at 14 – 16). With respect to RFC assessments, ALJ's are not required to include every alleged limitation in

their hypotheticals and RFC assessments; their responsibility is to "accurately convey" only "*credibly established limitations*" which "are medically supported and otherwise uncontroverted in the record." *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2003). With this standard in mind, the Court again finds the ALJ's decision rationale to be inadequate. Without an adequate discussion of the medical record and conflicting accounts of Plaintiff's functional limitations, the Court cannot properly exercise its duty to review. *Cotter*, 642 F.2d at 705 n. 7 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

At present, the ALJ apparently gave significant weight to the functional assessment of Dr. Mustovic in concluding that his RFC adequately encapsulated Plaintiff's degree of functionality. (R. at 15 – 17). However, the ALJ – although seemingly relying upon Dr. Mustovic's findings – failed to address the notations indicating that Plaintiff could only stand and walk for two to four hours at a time, and sit for only four hours. (R. at 250 – 55). This appears to indicate that Plaintiff's ability to sit, stand, and or walk varies daily between six and eight hours. As explained by the vocational expert at Plaintiff's hearing, this would not allow Plaintiff to engage in substantial gainful activity. (R. at 334 – 35). Due to the ALJ's failure to explain why his RFC assessment accurately conveyed all of Plaintiff's credibly established medical limitations in spite of the omission of Dr. Mustovic's objective findings, the court cannot find that substantial evidence supported the ALJ's RFC assessment.

## C. Hypothetical Question

Finally, with respect to Plaintiff's contention that the ALJ's hypothetical question was inadequate to convey all of Plaintiff's credible limitations, in light of the above discussion, it is clear that the ALJ failed to provide a thorough analysis of the medical evidence underlying Plaintiff's claim for disability benefits. As a result, the court cannot find that substantial

evidence established that all of Plaintiff's credibly established limitations were properly incorporated therein.

## VI. CONCLUSION

Based upon the foregoing, remand of the ALJ's decision is supported due to a lack of discussion adequate to constitute substantial evidence. "On remand, the ALJ shall fully develop the record and explain [his or her] findings . . . to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F. 3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

Accordingly, Plaintiff's Motion for Summary Judgment is granted, to the extent it seeks reconsideration, and is denied, to the extent it seeks a direct award of benefits. Defendant's Motion for Summary Judgment is denied. The decision of the ALJ is vacated and remanded for further consideration consistent with this opinion. An appropriate Order follows.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Christine M. Nebel, Esq.
       Michael Colville
       Assistant United States Attorney

       (*Via Electronic Mail*)